1

2

3

4                           **UNITED STATES DISTRICT COURT**

5                                **DISTRICT OF NEVADA**

6    ROBERT YBARRA, JR.,                          Case No.: 3:00-cv-00233-GMN-VPC

7              Petitioner                                         **ORDER**

8    v.

9    WILLIAM GITTERE, et al.,

10             Respondents

11

12         This habeas proceeding under 28 U.S.C. § 2254 is on remand from the United States

13   Court of Appeals for the Ninth Circuit. The court of appeals issued a decision vacating this

14   court's order denying petitioner Ybarra's motion for relief from judgment under Rule 60(b) of

15   the Federal Rules of Civil Procedure. *Ybarra v. Filson*, 869 F.3d 1016 (9ᵗʰ Cir. 2017). Ybarra's

16   Rule 60(b) motion sought to re-open his federal habeas proceedings to allow him to add a claim

17   based on *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that the Eighth Amendment

18   prohibits the execution of intellectually disabled persons.[1] ECF No. 176. This court denied the

19   motion upon concluding that Ybarra's *Atkins* claim would be futile because this court would be

20

21

22   ─────────────────────
     [1] *Atkins* used the terms "mentally retarded" and "mental retardation" but "intellectually disabled"
23   and "intellectual disability" are now the preferred nomenclature in the legal and medical
     community. *See Hall v. Florida*, 572 U.S. 701, 704 (2014). The former terms are used herein
     only to accurately quote from cited sources.

required to defer, under 28 U.S.C. § 2254(d),[2] to the Nevada Supreme Court's denial of the claim. ECF No. 228. As discussed below, the court of appeals identified discrete errors in this court's AEDPA analysis and remanded for this court to reconsider its denial of Ybarra's motion for relief from judgment. Having done so, this court concludes, for reasons that follow, that Ybarra's Rule 60(b) motion is denied.

## I.      BACKGROUND

Most of the history of this case that is relevant to the issues decided herein is recounted in the Ninth Circuit's 2017 opinion. *See Ybarra*, 869 F.3d at 1019-21. The court of appeals identified that following errors in relation to this court's AEDPA analysis of Ybarra's *Atkins* claim:

> First, it overlooked a number of instances where the Nevada Supreme Court contradicted the very clinical guidelines that it purported to apply, which is especially problematic in light of the recent decision in *Brumfield v. Cain*, —— U.S. ——, 135 S.Ct. 2269, 192 L.Ed.2d 356 (2015). Second, it erred when it refused to consider the Greenspan report.

*Ybarra*, 869 F.3d at 1023.

In relation to the first error, the court of appeals concluded that the Nevada Supreme Court's intellectual disability determination "passes muster under § 2254(d)(1)." *Id*. at. 1024. With respect to § 2254(d)(2), however, the court of appeals determined that the Nevada Supreme Court made a "number of contradictory statements" that this court "overlooked." *Id*. at 1027. The court of appeals was careful to point out that it reserved judgment "as to whether the Nevada Supreme Court's intellectual disability determination was reasonable, in which case the district

---

[2] In particular, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See Ybarra*, 869 F.3d at 1019.

court should again defer to it; or unreasonable, in which case the district court should 'proceed to consider' Ybarra's *Atkins* claim de novo." *Id*. at 1019 (citation omitted).

The "Greenspan report" refers to a report "authored by Dr. Stephen Greenspan, . . . who criticized the state courts' analyses and argued that their opinions incorporated 'questionable lay stereotypes.'" *Id*. at 1020–21. Even though this report was not presented to the Nevada Supreme Court until Ybarra filed a second request for the court to reconsider the denial of his *Atkins* claim, the court of appeals held that it "was part of the [state court] record under *Pinholster*[3] because it was not expressly stricken." *Id*. at 1030 (footnote added). Once again, the court of appeals reserved judgment as to "whether the Greenspan report changes the outcome under AEDPA." *Id*. Thus, that issue is also before this court on remand.

In furtherance of the Ninth Circuit's remand, this court entered an order on November 21, 2017, directing Ybarra to file a brief setting forth his position with respect to the issues identified by the court of appeals. After requesting several extensions of time, Ybarra filed his brief in April 2018. Respondents filed a response in September of 2018, after also requesting several extensions. Ybarra filed a reply in January 2019.

## II.   STATE COURT ADJUDICATION OF YBARRA'S *ATKINS* CLAIM

In March 2003, Ybarra filed a habeas petition in the state district court that included an Eighth Amendment claim under *Atkins*. The state district court dismissed the claim on procedural grounds. On appeal, the Nevada Supreme Court reversed, citing Nevada's then-recent adoption of Nev. Rev. Stat. § 175.554(5), which allows a person sentenced to death to move to set his sentence aside on the grounds that he is intellectually disabled, provided the court has not

---

[3] *Cullen v. Pinholster*, 563 U.S. 170 (2011).

previously decided the issue.[4] Ybarra then filed a motion in the state district court to set aside his death sentence pursuant to that provision.

In April 2008, the state district court conducted a two-day evidentiary hearing on Ybarra's motion "at which Ybarra presented the testimony of two expert witnesses, the State presented the testimony of an expert witness, and the court considered exhibits totaling more than 3,000 pages." *Ybarra v. State*, 247 P.3d 269, 271 (Nev. 2011). One of Ybarra's experts was a psychologist, Dr. David Schmidt, who had been retained in 2000, pre-*Atkins*, to do neuropsychological testing of Ybarra to help develop mitigation evidence. ECF No. 211-3 at 68-69. He generated a report in August 2002, post-*Atkins*, which included testing that, according to Dr. Schmidt, placed Ybarra's intellectual functioning in the "mildly mentally retarded range." ECF 211 at 50-51; ECF No. 211-1 at 2-20. Ybarra's other expert was a psychiatrist, Dr. Mitchell Young, who evaluated Ybarra in March of 2008. ECF No. 212 at 57-59. According to his report, Ybarra suffered from deficits in adaptive functioning, going back to his developmental period, that are "consistent with someone in the mild to borderline mentally retarded range." ECF No. 211-2 at 65-71; ECF No. 211-3 at 2-18.

The State presented the testimony of a clinical neuropsychologist, Dr. Theodore Young, who tested Ybarra in September of 2007. ECF No. 212-1 at 48. While his testing resulted in an IQ score (66) similar to that obtained by Dr. Schmidt (60), Dr. T. Young opined in his subsequent report that the result was invalid due to malingering. ECF No. 214 at 2-7. His report also criticized Dr. Schmidt's testing and findings and concluded that nothing in the records he (Dr. T. Young) reviewed "indicat[ed] that Mr. Ybarra suffered from mental retardation as

---

[4] The Ninth Circuit's opinion correctly notes that Section 175.554(5) was enacted in response to *Atkins*. *Ybarra*, 869 F.3d at 1020 n.3. However, the provision was enacted in 2003, not 2015 as the opinion indicates. *See* Nevada 2003 Session Laws, Ch. 137 (A.B. 15).

defined by Nevada law." *Id.* The exhibits presented to the state district court included "school records, mental health and medical records, military records, prison records, and letters and other communications (primarily prison kites) Ybarra authored during his incarceration." *Ybarra*, 247 P.3d at 277 (footnotes omitted).

In a detailed 46-page order, the district court determined that Ybarra had failed to meet his burden of proving intellectual disability. ECF No. 177 at 30-45, ECF No. 177-1 at 1-30. The court's analysis began by noting that the Nevada legislature had, in 2003, responded to *Atkins* by establishing procedures for a defendant to avoid the death penalty on the ground that he is "mentally retarded." ECF No. 177 at 33. The court further noted that "mentally retarded," in this context, is defined as "significant subaverage general intellectual functioning which exists concurrently with deficits in adaptive behavior and manifested during the developmental period." *Id*. (quoting Nev. Rev. Stat. § 174.098(7)).

As a matter of first impression, the state district court determined that "the developmental period is up to age 18." *Id* at 39. With respect to Prong 1,[5] the court determined that Ybarra had not demonstrated, by a preponderance of the evidence, the existence of significant subaverage intellectual functioning. *Id*. at 39-45; ECF No. 177-1 at 1-19. This determination was based largely on a finding that Ybarra's test results had been the product of malingering. *Id*. The court also found that the evidence did not support a finding of deficits in adaptive behavior prior to age 25. ECF No. 177-1 at 19-26. The court then explained its concerns with the clinical judgments of

---

[5] As discussed by the Ninth Circuit and for the purposes of this order, the intellectual disability test consists of three "prongs:" Prong 1 is subaverage general intellectual functioning; Prong 2 is deficits in adaptive behavior; and Prong 3 is manifestation during the developmental period. *See Ybarra*, 869 F.3d at 1023–24.

Dr. Schmidt and Dr. M. Young. *Id.* at 26-30. Ybarra appealed the state district court's denial of *Atkins* relief to the Nevada Supreme Court.

Prior to Ybarra's appeal, the Nevada Supreme Court had yet to consider in a published decision, if at all, the provisions Nevada had enacted in response to *Atkins*.[6] The Nevada Supreme Court began its analysis by noting that Nevada's statutory definition of intellectual disability conforms to the clinical definitions used by two professional associations that are concerned with intellectual disability —the American Association on Intellectual and Developmental Disabilities (AAIDD)[7] and the American Psychiatric Association (APA). *Ybarra*, 247 P.3d at 273, *see also Atkins*, 536 U.S. at 308 n. 3 (citing the definitions of these two organizations). Relying on the age-of-onset used by the AAIDD and the APA and most jurisdictions, the state supreme court affirmed the age of 18 years as the end of the "developmental period." *Ybarra*, 247 P.3d at 276.

For a standard of review, the court announced it would defer to the lower court's factual findings as long as they are supported by substantial evidence and not clearly erroneous, but that it would review the legal consequences of those findings de novo. *Id.* After defining the elements of intellectual disability, the court examined the evidence presented in the district court, the district court's decision, and Ybarra's challenges to that decision, and concluded that the district

---

[6] Nev. Rev. Stat. § 174.098 allows a defendant facing a capital sentence to file a motion, not less than 10 days before the date set for trial, to declare that he is intellectually disabled. The provision Ybarra employed, Nev. Rev. Stat. § NRS 175.554(5), allows a person already sentenced to death without a prior determination regarding intellectual disability under Nev. Rev. Stat. § 174.098 to file a motion to set aside the death penalty by reason of intellectual disability. In either case, the proceedings on the motion are governed by Nev. Rev. Stat. § 174.098(2)–(7). *See Ybarra*, 247 P.3d at 273 n.3.

[7] Although this name had been adopted in 2006, the Nevada Supreme Court in *Ybarra* chose to refer to the organization by its prior name, the American Association on Mental Retardation (AAMR), because that was the name when *Atkins* was decided and when Ybarra first sought relief. *See id.* at 273 n.4.

1  court did not err in determining that Ybarra failed "to show that he suffered from significant

2  subaverage intellectual functioning that manifested during the developmental period" and "to

3  meet his burden of proving adaptive behavior deficits that manifested during the developmental

4  period." *Id*. at 276-85. The specific aspects of the Nevada Supreme Court's decision relevant to

5  the Ninth Circuit's remand are discussed in the analysis below.

6  **III.    AEDPA STANDARD**

7       When the state court has adjudicated a claim on the merits, AEDPA forecloses habeas

8  relief in federal court unless the state court adjudication "resulted in a decision that was contrary

9  to, or involved an unreasonable application of, clearly established Federal law, as determined by

10  the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an

11  unreasonable determination of the facts in light of the evidence presented in the State court

12  proceeding," *id*. § 2254(d)(2). The phrase "clearly established Federal law" in § 2254(d)(1)

13  refers to the "governing legal principle or principles" previously articulated by the Supreme

14  Court. *Lockyer v. Andrade*, 538 U.S. 63, 71 72 (2003). The § 2254(d)(2) standard is met only if

15  this court is "convinced that an appellate panel, applying the normal standards of appellate

16  review, could not reasonably conclude that the finding is supported by the record." *Murray v.

17  Schriro*, 745 F.3d 984, 999 (9th Cir. 2014) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th

18  Cir. 2004), *abrogated on other grounds as stated in Murray*, 745 F.3d at 1000). This court's

19  review under § 2254(d) is limited to the record that was before the state court. *See Cullen v.

20  Pinholster*, 563 U.S. 170, 181 (2011).

21       If a petitioner satisfies either subsection of § 2254(d), then the federal court considers the

22  claim de novo. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (holding that when section

23  2254(d) is satisfied, "[a] federal court must then resolve the claim without the deference AEDPA

1  otherwise requires"); *Frantz v. Hazey*, 533 F.3d 724, 737 (9th Cir. 2008). Thus, this court may

2  grant habeas relief only if it concludes both that § 2254(d) is satisfied and that, on de novo

3  review, the petitioner is in custody in violation of the Constitution of the United States. *See*

4  *Pizzuto v. Yordy*, 947 F.3d 510, 523 (9th Cir. 2019).

5  **IV.   DISCUSSION**

6  Ybarra contends that the Nevada Supreme Court's adjudication of his *Atkins* claim meets

7  both prongs of § 2254(d) and that, applying de novo review, he is entitled to relief under *Atkins*.

8  A.  Section 2254(d)(1)

9  In his opening brief on remand, Ybarra relies on *Hill v. Anderson*, 881 F.3d 483, 492 (6th

10  Cir. 2018), to argue that, notwithstanding the Ninth Circuit's aforementioned § 2254(d)(1)

11  determination, the inclusion of the Greenspan report as part of the state court record makes the

12  Nevada Supreme Court's decision an unreasonable application of, and contrary to, *Atkins*. The

13  argument is premised on a contention that *Hill* held that a state court's failure to adhere to

14  clinical standards for intellectual disability constitutes an unreasonable application of *Atkins*.

15  According to Ybarra, the Greenspan report highlights how the Nevada Supreme Court deviated

16  from clinical standards, so it brings § 2254(d)(1) back into play.

17  Granting *certiorari*, the Supreme Court subsequently overruled, explicitly, the holding in

18  *Hill* that Ybarra relies upon in his opening brief. *See Shoop v. Hill*, 139 S. Ct. 504 (2019).

19  Specifically, the Court in *Shoop* determined that the holding in *Moore v. Texas* (*Moore I*), 137 S.

20  Ct. 1039 (2017),[8] was not clearly established federal law for the purposes of deciding whether

21

22  _____

22  [8] In *Moore I*, the Court held that, while strict adherence to medical standards may not be required, determinations of intellectual disability "must be 'informed by the medical community's diagnostic framework.'" 137 S. Ct. at 1048 (quoting *Hall v. Florida*, 572 U.S. 701, 721 (2014)). As such, a court deciding an *Atkins* claim is not permitted to "disregard of current medical standards." *Id*. at 1049.

1  the state court's pre-*Moore I* decision satisfied § 2254(d)(1). *Id.* at 507-08. Thus, the court of

2  appeals erred by relying "so heavily on *Moore*" in its § 2254(d)(1) analysis. *Id.* at 509.

3      In his reply filed after the issuance of *Shoop*, Ybarra modifies his argument to claim that,

4  even without *Hall* and *Moore I*, the Nevada Supreme Court's decision was an unreasonable

5  application of, and contrary to, *Atkins*. He fails to adequately explain, however, how the

6  Greenspan report requires this court to deviate from the Ninth Circuit's conclusion that the

7  Nevada Supreme Court's intellectual disability determination "passes muster under §

8  2254(d)(1)." *Ybarra*, 869 F.3d at 1024. Thus, that conclusion will not be altered.

9      B.  Section 2254(d)(2)

10     The Ninth Circuit Court of Appeals determined that this court's § 2254(d)(2) analysis

11  was flawed because it overlooked errors by the Nevada Supreme Court comparable to those

12  committed by the Louisiana court in *Brumfield*. *Ybarra*. 869 F.3d at 1025-26. The Ninth Circuit

13  noted that "Louisiana, like Nevada, relied on guidance from the APA and the AAMR to define

14  intellectual disability," but the Louisiana state court, in denying *Atkins* relief, "made a number of

15  statements that clearly contradicted those same guidelines." *Id*. The Ninth Circuit identified the

16  following instances as examples of the Nevada Supreme Court doing likewise.

17     First, the Nevada Supreme Court "ignored evidence that Ybarra was bullied in school on

18  the ground that it was irrelevant under Prong 2." *Id* at 1026. Second, "under Prong 3, the Nevada

19  Supreme Court suggested that any diagnostic test conducted after the age of 18 was 'of little

20  value.'" *Id*. (quoting *Ybarra*, 247 P.3d at 283). Third, while the Nevada Supreme Court's

21  "malingering determination was reasonable …,  the Prong 1 determination was unreasonable to

22  the extent that it was based on the court's lay perception that Ybarra did not 'look like' a

23  disabled person." *Id* at 1026-27.

1    A recent decision from the Ninth Circuit calls into question whether a state court's

2  alleged failure to properly apply clinical standards to an *Atkins* claim is subject to analysis under

3  § 2254(d)(2). *See Pizzuto*, 947 F.3d at 530 (holding that state court determinations inconsistent

4  with clinical standards discussed in *Atkins* and *Hall* were not reviewable under § 2254(d)(2)

5  because they involve "legal conclusions," not "factual determinations"). *Pizzuto* is

6  distinguishable from this case and *Brumfield*, however, because "the Idaho Supreme Court did

7  not purport to determine whether Pizzuto was intellectually disabled under the clinical

8  definitions." *Pizzuto*, 947 F.3d at 530. So, despite *Pizzuto*, analysis under § 2254(d)(2) is called

9  for where the state court makes findings in the context of determining whether the petitioner

10  meets certain clinical standards for intellectually disability. Thus, if a state court's decision is

11  based on findings that contradict the very intellectual disability guidelines it purports to be

12  applying, it may fail to pass muster under § 2254(d)(2).[9]

13    Here, the state district court cited to AAMR, Mental Retardation: Definition,

14  Classification, and Systems of Supports (10th ed. 2002) (hereinafter the "AAMR-10"),

15  throughout its decision and used the manual's guidelines to determine whether Ybarra is

16  intellectually disabled. ECF No. 177 at 38-45, ECF No. 177-1 at 1-27. The Nevada Supreme

17  Court relied on the same source in its opinion and also referenced the APA and the Diagnostic

18  and Statistical Manual of Mental Disorders (4th ed. 2000) (commonly referred to as the DSM-

19  IV). *Ybarra*, 247 P.3d at 274-75. Against the backdrop of these guidelines and the Ninth

20  Circuit's remand, the court now addresses "whether the Nevada Supreme Court made a

21

22    [9] As discussed above, however, the extent to which the state court is required to adhere

23  clinical standards is dictated by Supreme Court precedent in place at the time and is reviewable
    under § 2254(d)(1).

1  reasonable or an unreasonable determination of fact when it concluded that [Ybarra] is not

2  [intellectually disabled]." *Ybarra*, 869 F.3d at 1033.

3                                      *Adaptive behavior deficits*

4         In deciding Ybarra's appeal, the Nevada Supreme Court recognized that "'[a]daptive

5  behavior' has been defined as the 'collection of conceptual, social, and practical skills that have

6  been learned by people in order to function in their everyday lives,' and thus, 'limitations on

7  adaptive behavior are reflected by difficulties adjusting to ordinary demands made in daily life.'"

8  *Ybarra*, 247 P.3d at 274 (citations omitted). The court recounted the state district court's ruling

9  on alleged deficits in adaptive behavior as follows:

10         The district court also concluded that Ybarra failed to present sufficient
   evidence to establish significant adaptive behavior deficits that manifest during
11         the developmental period. As to Ybarra's adaptive behavior before age 18, the
   district court concluded that minimal evidence supported any adaptive deficits.
12         The court specifically found incredible Dr. Schmidt's conclusion that bullying
   by school peers and poor academic performance indicated an adaptive deficit, and
13         instead found that Ybarra's academic and social problems could also be explained
   by his alcohol and drug abuse, as the other defense expert (Dr. M. Young)
14         acknowledged. And the court pointed out that despite these problems, Ybarra
   managed to attend night school to secure his adult education diploma while
15         maintaining employment. The district court also rebuffed Dr. Schmidt's opinion
   that Ybarra had adaptive deficits because he held only menial or minimum-wage
16         jobs, noting that persons under 18 typically hold menial jobs and that Ybarra
   worked as a forklift driver for several years. The district court also found
17         unpersuasive Dr. Schmidt's reliance on the lack of evidence that Ybarra lived
   independently, at least before the age of 18, as proof of adaptive deficits because
18         most children do not live independently before the age of 18.

19         The district court was also unpersuaded by evidence Ybarra introduced
   concerning adaptive-behavior deficits exhibited between the ages 18 and 25 years.
20         In particular, the district court found incredible Dr. Schmidt's conclusion that
   Ybarra was unable to hold a job, noting that Ybarra was employed for lengthy
21         periods of time at salaries that exceeded minimum wage at the time. As to
   Ybarra's brief military service, the district court rejected Dr. Schmidt's opinion
22         that this evidenced adaptive-behavior deficits as Ybarra was discharged for
   reasons that had nothing to do with his ability to adjust to the ordinary demands of
23         daily life—he was discharged from the Marine Corps the first time for
   homosexuality and the second time for fraudulent enlistment, and was discharged

from the Army National Guard for a medical condition. Further, the district court found that the record did not support Dr. Schmidt's conclusion that Ybarra was unable to live independently, pointing out that Ybarra moved to California, Oregon, Montana, and Nevada and secured living quarters and employment, and was married for a brief time.

*Ybarra*, 247 P.3d at 280–81.

In affirming the state district court's findings, the Nevada Supreme Court rejected Ybarra's arguments that the lower court "(1) disregarded evidence substantiating [adaptive behavior deficits] and (2) improperly relied on its own lay opinions that are contrary to the evidence." *Id.* at 284. With respect to the former, the court concluded:

> [T]he district court was in the best position to assess the credibility of the experts' testimony, and, although Ybarra disagrees with the district court's findings related to adaptive deficits, substantial evidence supports the district court's finding that Ybarra did not meet his burden of proving this element of mental retardation.

*Id.* As to the latter, the court held that, rather than improperly rely on its lay opinion, the lower court "considered the evidence, making reasonable inferences from it, and ultimately concluded that Ybarra failed to show adaptive behavior deficits considering his alcohol and drug abuse during his youth, his work record, military service, ability to live independently and travel, and written communications in prison." *Id.* The question posed on remand is whether state court's findings on adaptive behavior deficits were reasonable despite the Ninth Circuit's determination that the state court erroneously ignored evidence that Ybarra was bullied in school.

Ybarra argues that "[t]he Nevada Supreme Court's analysis of adaptive behavior resulted in an unreasonable determination of the facts because it ignored the clinical standards." ECF No. 299 at 64. As noted, the Ninth Circuit faulted the Nevada Supreme Court for "ignor[ing] evidence that Ybarra was bullied in school on the ground that it was irrelevant under Prong 2." *Ybarra*, 869 F.3d at 1026. In particular, the Ninth Circuit noted that "the AAMR specifically lists

1  'gullibility' and an inability to 'avoid[ ] victimization' as examples of limited social adaptive

2  skills." *Id*.

3        Having reviewed the state court record in light of the Ninth Circuit's decision, this court

4  concludes that the Nevada Supreme Court's Prong 2 determination was based on an

5  unreasonable determination of the facts. This conclusion is based, in part, on the error the Ninth

6  Circuit identified – i.e., the Nevada courts' failure to give due weight to evidence that Ybarra

7  was bullied in school. It is also based on abundant evidence of Ybarra's poor academic

8  performance and Dr. Greenspan's assessment based on objective testing.

9        The fact that Ybarra was the victim of bullying while in school and prior to the age of 18

10  is not disputed. Dr. Schmidt testified about Ybarra being the object of taunts and physical abuse

11  from his fellow students and opined that it demonstrated a deficit in adaptive behavior. ECF No.

12  211-4 at 5-6. The basis for this testimony was a 1969 report that provided detailed background

13  information on Ybarra, who was 15 years old at the time, for the apparent purpose of referring

14  him for psychological counseling. *Id*.; ECF No. 201-5 at 49.[10] Dr. Greenspan interviewed

15  Ybarra's cousin, Martin Ybarra, who, according to Greenspan's report, "indicated that kids in

16  school would call [Robert Ybarra] 'retard' on a daily basis, would pick on him unmercifully, and

17  cause him to come home crying repeatedly." ECF No. 177-2 at 44.

18        As noted by the Ninth Circuit, the state court erred by disregarding this evidence as

19  suggestive of an adaptive behavior deficit. Even so, respondents argue that Ybarra's

20  victimization could be attributed to his "problem behavior" rather than an adaptive behavior

21

22

23

[10] The report appears in the record with a letter from a psychiatrist, Dr. William M. Asher, M.D., which is dated one day after the report and recommends that Ybarra be referred "to State Vocational Rehabilitation for additional counseling." ECF No. 201-5 at 48. While the documents are obviously related, it is not clear that Dr. Asher was the author of the report.

deficit, which, according to the respondents, was another reason the state court rejected the evidence, relying on AAMR guidelines. ECF No. 307 at 34. The problem with this argument is twofold. First, the "problem behavior" the state district court cited in this context was "the large amounts of alcohol and drugs [Ybarra] was taking every day," but even if such was occurring, there is a paucity of evidence in the record showing a connection between Ybarra's purported substance abuse and the bullying he endured.[11] Second, the state district court cited to the AAMR-10 for the proposition that "the presence of problem behavior is not considered to be a limitation in adaptive behavior" (ECF No. 177-1 at 23), but the court lacked any clinical basis for designating Ybarra's difficulties interacting with his peers as the former to the exclusion of the latter. *See* AAMR-10 at 74-80; *Moore v. Texas* (*Moore II*), 139 S. Ct. 666, 671 (2019) (holding that court of appeals erred by requiring petitioner "to show that the 'cause of [his] deficient social behavior was related to any deficits in general mental abilities' rather than 'emotional problems'").

        In addition to Ybarra's social limitations, evidence in the record shows that Ybarra had significant deficits in academic skill in the developmental period. His report cards and transcripts show that, from the fourth grade until he left high school, he received mostly Ds and Fs.[12] ECF No. 212-3 at 34-59; ECF No. 201-5 at 53. In the letter mentioned above, sent when Ybarra was 15 years old, Dr. Asher advised the vice principal of Ybarra's high school that Ybarra "should

---

[11] The state district court appears to have made this connection based on a portion of a single sentence from Dr. M. Young's written evaluation. ECF No. 177-1 at 23 fn.64 (citing to ECF No. 211-3 at 14). Viewed in context, the cited language from the evaluation does not support a finding that Ybarra was bullied because of his substance abuse. To the extent the Nevada Supreme Court adopted such a finding, it did so unreasonably. *See Ybarra*, 247 P.3d at 280.

[12] When he was 9 years old, about the time he was in the fourth grade, Ybarra suffered a significant head injury as result of being struck in the forehead with a railroad tie. ECF No. 177 at 34; *Ybarra*, 247 P.2d at 277.

1  receive a medical exclusion from school" because he had "gone about as far as he can within

2  limits of his intellectual and emotional capacities." ECF No. 201-5 at 49. In his testimony, Dr.

3  Schmidt considered Ybarra's academic performance to be among his adaptive behavior deficits.

4  ECF No. 211-4 at 2-6.

5         As with Ybarra's social problems, the state district court surmised that drug and alcohol

6  abuse were the cause Ybarra's academic problems, but again without appreciable testimony or

7  documentary evidence to support a causal connection. ECF No. 177-1 at 20, 23-24. The state

8  district court also rejected the possibility that academic failure could be an adaptive deficit

9  because Ybarra "continued in night school while working a job," which showed "his ability to

10  adapt and respond to a bad situation." *Id*. at 20. While not cited as a specific example of a

11  statement the Ninth Circuit found "troubling," this is another instance of the state court rejecting

12  an expert opinion and substituting its own without any clinical basis for doing so. *See Ybarra*,

13  869 F.3d at 1026 (citing *Van Tran v. Colson*, 764 F.3d 594, 610 (6th Cir. 2014)).

14        Finally, Dr. Greenspan's report supports a finding that the Nevada Supreme Court

15  unreasonably found that Ybarra had failed to meet his burden of proving significant adaptive

16  behavior deficits. Dr. Greenspan used a standardize assessment instrument – the Behavior

17  Assessment Scale, 2nd Edition (ABAS-2) – to assess Ybarra's adaptive behavior, targeting the

18  ages 16-17. ECF No. 215-1 at 44-46. Administered to Ybarra's cousin Martin, who was able to

19  provide specific information about Ybarra's functioning during the relevant period, the ABAS-2

20  assessment produced scores of 63 on Conceptual Adaptive Behavior, 72 on Practical Adaptive

21  Behavior, 66 on Social Adaptive Behavior, and 60 on Composite (overall) Adaptive Behavior.

22  *Id*. According to Greenspan's report, the scores "far exceed[] the AAIDD requirement" which

23  requires "significant deficits in only one of the four ABAS-2 areas." *Id*.

15

Thus, based on the foregoing, this court concludes that the Nevada Supreme Court's adaptive behavior deficit analysis relied on an unreasonable determination of the facts for the purposes § 2254(d)(2).

*Intellectual functioning*

For the intellectual functioning component, the Nevada Supreme Court relied on the DSM-IV standard which provides that "[b]ecause 'there is a measurement error of approximately 5 points in assessing IQ, … the clinical definitions indicate that 'individuals with IQs between 70 and 75' fall into the category of subaverage intellectual functioning." *Ybarra*, 247 P.3d at 274. The court also recognized evidence other than objective IQ testing may be used to demonstrate subaverage intellectual functioning, "[b]ut the burden remains on the defendant to present evidence affirmatively establishing this element of mental retardation." *Id*. (citing Nev. Rev. Stat. § 174.098(5)(b)).

The court recounted the state district court's ruling on subaverage intellectual functioning behavior as follows:

> The district court concluded that Ybarra failed to present sufficient evidence to establish significant subaverage intellectual functioning that manifested during the developmental period. The court was persuaded in part by the fact that Ybarra was not tested for mental retardation before age 18, and despite contact with various school officials, no one suspected that he was mentally retarded. The district court observed that Ybarra obtained his adult education diploma and that military records described him as having "dull normal" or "borderline" intelligence, which the experts agreed was not in the range of mental retardation. The district court concluded that, at best, the evidence showed that Ybarra had below average intelligence prior to age 18.

> The district court explained that even if it accepted Dr. Schmidt's testimony that the developmental period extends to age 25, noting that no jurisdiction has done so, Ybarra nevertheless failed to produce sufficient evidence of subaverage intellectual functioning that manifested before age 25, considering documentary evidence from other psychologists and psychiatrists describing Ybarra as having "borderline," normal, or low normal intelligence and IQ scores of 86 and 70 to 80. And the court rejected Dr. Schmidt's opinion regarding

16

Ybarra's intellectual functioning as incredible, noting that with all the testing and observation of Ybarra from 1979 to 2002, Dr. Schmidt was the first to conclude that Ybarra was mentally retarded but his report contained a "bold-faced disclaimer" that Ybarra's IQ score "may underestimate his actual intelligence functioning" "due to the severe distress that some portions of the ... testing caused" Ybarra. The district court also focused on Dr. Schmidt's admission that he gave no specific test for malingering, whereas the State's expert administered a test to detect malingering that produced a score that was "off the scale," indicating that Ybarra was malingering. The district court also found that Dr. Schmidt's conclusions regarding the effects of Ybarra's brain damage and of his poor judgment and limited ability to solve problems, handle stress, and deal with his hallucinations did not "withstand scrutiny in the context of Ybarra's real life actions and functioning." The district court further identified in great detail additional evidence of malingering and intellectual functioning that fell outside the range of mental retardation, including: (1) that Ybarra had a motive to fake performance on mental health tests; (2) reports by other mental health professionals that Ybarra was malingering or exaggerating symptoms of mental disorder and displaying psychotic behavior; (3) reports that Ybarra played cards, backgammon, scrabble, and other games while at a mental health facility (Lake's Crossing); (4) a report that Ybarra's hallucinations were not "valid"; (5) suggestions and inferences by mental health professionals that Ybarra feigned incompetence; (6) hundreds of prison kites concerning medical issues showing a level of intelligence beyond a mildly mentally retarded individual; and (7) medical progress notes suggesting that Ybarra feigned mental illness to remain in the prison mental health unit.

*Ybarra*, 247 P.3d at 279-80 (footnote omitted).

In affirming the state district court's findings, the Nevada Supreme Court rejected Ybarra's arguments that the lower court "(1) erroneously focused on [an] 1981 IQ test to the exclusion of the IQ results Dr. Schmidt obtained and (2) erroneously relied on the tests administered by the State's expert because he used improper testing instruments, scoring, and administration techniques." *Id*. at 281. In affirming the lower court's reliance on the 1981 IQ test that yielded a score of 86, the Nevada Supreme Court held that the lower court did not disregard Dr. Schmidt's testimony about the Flynn effect,[13] but instead gave valid reasons for finding it

---

[13] As noted by the Nevada Supreme Court, "the Flynn effect … refers to a body of work suggesting that IQ test scores show an upward drift over time until the test is re-normed." *Ybarra*, 247 P.3d at 279.

incredible. *Id*. at 282. It also held that the lower court relied on other evidence that corroborated the result of the 1981 IQ test and that a determination as to the Flynn effect was unnecessary because the test "was administered well after [Ybarra] turned 18 years of age." *Id*. at 282-83.

As for Ybarra's argument that the lower court improperly relied on Dr. T. Young's test results, the Nevada Supreme Court rejected this argument because the score on the IQ test Dr. T. Young administered, if valid, would have placed Ybarra in the mild range of intellectual disability and the result of the TOMM (Test of Memory Malingering) was corroborated by "a wealth of other evidence" that Ybarra was malingering. *Id*. at 283.

The Ninth Circuit agreed that the Nevada courts' malingering determination was reasonable in light of the clinical expertise of Dr. T. Young, who "specifically described Ybarra's 'bizarre' performance on a number of tests, including a 'complex figure test' where his score was worse than that of an Alzheimer's patient or a person with a 'debilitating' or 'severely horrible disease[ ].'" *Ybarra*, 869 F.3d at 1026. The Ninth Circuit's concern, however, was the Nevada Supreme Court's statement that "[t]he record as a whole ... portrays Robert Ybarra as a person who does not have significant subaverage intellectual functioning." *Id*. (citing *Ybarra*, 247 P.3d at 282). The Ninth Circuit noted that, based on "relevant clinical guidelines," such an assessment by the state court was unreasonable because it "is a task that requires specialized professional training.'" *Id*. (quoting AAMR-10, at 51). Thus, the question posed on remand with respect to intellectual functioning is whether the "[state] court's lay perception that Ybarra did not 'look like' a disabled person" infected its analysis to the extent that it rendered its Prong 1 determination unreasonable. *Id*. at 1026-27.

As Ybarra notes in his opening brief, the relevant clinical guidelines "require that subaverage intellectual functioning be evaluated based on standardized IQ tests." ECF No. 299 at

18

55 (citing the AAMR-10 at 52, DSM-IV-TR at 41). In addition, Nevada places on the defendant raising an *Atkins* claim "the burden of proving by a preponderance of the evidence that the defendant is intellectually disabled." Nev. Rev. Stat. § 174.098(5)(b). At the core of the state district court's decision is a finding that Ybarra had not presented evidence of a valid IQ score that would place him in the category of subaverage intellectual functioning. ECF No. 177 at 39-45, ECF No. 177-1 at 1-19. Added to that was an IQ score that placed Ybarra well above the intellectual disability threshold that the state district court determined to be valid and "consistent with the numerous other doctors and evaluators who believed that Ybarra was dull-normal or borderline (which is not mentally retarded)." ECF No. 177-1 at 1.

Dr. Schmidt tested Ybarra, then 48 years old, using the Wechsler Adult Intelligence Scale (3d edition) (WAIS–III) and obtained a full-scale IQ score of 60.  ECF 211 at 50-51; ECF No. 211-1 at 2-20. The state district court's reasons for rejecting the result as evidence of subaverage intellectual functioning are recounted in the above excerpt from the Nevada Supreme Court's opinion. One reason was Dr. Schmidt's disclaimer regarding the accuracy of the result. ECF No. 177-1 at1-2. Dr. Schmidt testified at the state court evidentiary hearing that "it was a problematic testing at best." ECF No. 211-3 at 70. The state district court also determined, citing both Dr. Schmidt's and Dr. T. Young's testimony, that Dr. Schmidt had failed to adequately account for the possibility that Ybarra was malingering. ECF No. 177-1 at 2-3. The Nevada Supreme Court did not disturb this finding on appeal.

There was only one other IQ score presented to the state court when it adjudicated Ybarra's *Atkins* claim that placed him in the category of subaverage intellectual functioning. That was the full-scale IQ score of 66 obtained by Dr. T. Young when he attempted to administer the Wechsler Abbreviated Scale of Intelligence (WASI) in 2007, when Ybarra was 54 years old.

1   ECF 214 at 2-7. Dr. T. Young testified unequivocally that, due to Ybarra's bizarre responses and

2   his results on the TOMM, the IQ score "was not even closed to being valid." ECF No. 212-1 at

3   56-61. Giving credence to Dr. T. Young's opinion, the state district court found the score to be

4   invalid. ECF No. 177-1 at 18-19. Here again, the Nevada Supreme Court did not disturb this

5   finding on appeal.

6        The 1981 IQ test that resulted in a score of 86 was the WAIS administered by Dr. Martin

7   Gutride, when Ybarra was 27 years old. ECF No. 205-1 at 5-8; *Ybarra*, 247 P.3d at 278. In his

8   testimony, Dr. Schmidt questioned the result because the test was 26 years old when it was

9   administered and, due to the Flynn effect, the score would "artificially inflate the intellectual

10  functioning of the individual that's in the mildly retarded range." ECF No. 211-4 at 35-36. He

11  also expressed concern that the test "was given by an intern." ECF No. 212 at 6. Dr. Schmidt

12  testified that Flynn effect could have inflated the score by 15 points. ECF No. 212-2 at 63.[14]

13       The state district court found Dr. Schmidt's testimony on the Flynn effect to be

14  unconvincing. ECF NO. 177 at 45, ECF No. 177-1 at 1. Specifically, the court noted that

15  "numerous courts ha[d] rejected the notion of adjusting IQ scores to accommodate the Flynn

16  effect," the AAMR manual did not specifically recommend an adjustment, and, in any event, the

17  adjustment would at most be only 8 points, bringing the score down to 78. *Id*. The court also

18  noted that Dr. Schmidt, in his testimony, "admitted that he really could not talk about the validity

19  of the 1981 test score." *Id*. (citing ECF No. 212 at 22-23). On appeal, the Nevada Supreme Court

20  affirmed the state district court's assessment of the 1981 IQ test. *Ybarra*, 247 P.3d at 282.

21

22

23

---

[14] Dr. Schmidt also conceded that the WAIS was the best IQ test available to Dr. Gutride at the time because the WAIS-R did not come out until later in 1981. ECF No. 212-2 at 61-62.

1    Given these findings, this court is unable to conclude that the "[state] court's lay

2 perception that Ybarra did not 'look like' a disabled person" had a significant impact on the

3 Nevada Supreme Court's determination that Ybarra did not fall into the category of subaverage

4 intellectual functioning. Again, Ybarra had the burden of proving this element by a

5 preponderance of the evidence. And, while a qualifying IQ score on a standardized test was not

6 imperative to meet the burden, Ybarra concedes that clinical guidelines "require that subaverage

7 intellectual functioning be evaluated based on standardized IQ tests." ECF No. 299 at 55 (citing

8 the AAMR-10 at 52, DSM-IV-TR at 41).

9    The Nevada Supreme Court did not unreasonably find any of Ybarra's IQ scores invalid

10 based on its lay perception of Ybarra's intellectual functioning. Though not specified as such, the

11 statement by the Nevada Supreme Court that raised concern with the Ninth Circuit was a direct

12 quote from the state district court's decision. *Ybarra*, 869 F.3d at 1026 (citing *Ybarra*, 247 P.3d

13 at 282); ECF No. 177-1 at 18. The statement appears near the end of a section captioned,

14 "Malingering and Other Evidence of Intellectual Functioning," and the sentence from which it

15 was taken read, in its entirety, as follows:

16    "The record as a whole (irrespective of the various IQ test scores) portrays Robert
       Ybarra as a person who does not have significant subaverage intellectual
17     functioning now or during his developmental years."

18 ECF No. 177-1 at 18.

19    In the section, the state district court recounted "numerous observations by various

20 doctors and others that Ybarra is a faker or malingering." *Id*. at 4-18. The court also cited to

21 "numerous letters written by Ybarra while … awaiting trial" and the "hundreds of 'kites'"

22 written while he was in prison. *Id*. According to the court, these writings contained evidence of

23 both Ybarra attempting to manipulate the legal process and a "clarity of thought" or "level of

1   intelligence" inconsistent with "the claim of significant subaverage intellectual functioning." *Id*.

2   In addition, the court quoted several examples from "hundreds of pages of medical progress

3   notes" which, according to the court, "portray[ed] Ybarra as a man who knows how to

4   manipulate and fake (or exaggerate) symptoms of mental illness to accomplish his goals." *Id*.

5   Finally, *after* the statement quoted by the Ninth Circuit, the state district court concluded the

6   section by discussing Dr. T. Young's testing and noting his conclusion that the record contained

7   "no valid IQ test result for Ybarra below 70." *Id*. at 18-19.

8        Viewed in context, the Nevada Supreme Court's reference to the state district court's

9   observation about how "the record as a whole (irrespective of the various IQ test scores) portrays

10  Robert Ybarra" was not tantamount to the Nevada Supreme Court rejecting Ybarra's *Atkins*

11  claim because he "did not 'look like' a disabled person." Instead, Nevada Supreme Court was

12  making the point that, separate and apart from the 1981 IQ test score well above the threshold for

13  intellectual disability, the record contained ample evidence that Ybarra did not "suffer[] from

14  significant subaverage intellectual functioning" and that he was malingering. *Ybarra*, 247 P.2d at

15  282.

16       If the Nevada Supreme Court had relied on its "lay perception" of Ybarra as a reason to

17  reject convincing evidence of Ybarra's subaverage intellectual functioning, such as a valid IQ

18  score of 75 or below, this court agrees that such reliance would be cause for concern under

19  § 2254(d)(2). That is not what happened here, however. Instead, as discussed above, the state

20  district court found, and the Nevada Supreme Court affirmed, that the sub-75 scores obtained by

21  Dr. Schmidt and Dr. T. Young were invalid for reasons apart from the court's analysis and

22  finding that "[t]he record as whole … portray[ed] Robert Ybarra as a person who does not have

23  significant subaverage intellectual functioning." Because Ybarra did not otherwise meet his

1 burden of showing the state court that he satisfied Prong 1, this court cannot conclude that the

2 Nevada Supreme Court's Prong 1 determination was unreasonable under 28 U.S.C. § 2254(d)(2).

3       Dr. Greenspan's report does not change this result. While his report provided solid

4 evidence of Ybarra's adaptive behavior deficits, there are reasons to question Dr. Greenspan's

5 Prong 1 analysis. To begin with, the court is troubled that two versions of the report have been

6 filed in this case, with the first demonstrating that Dr. Greenspan failed to carefully review the

7 materials upon which he based his Prong 1 findings.

8       The first version of the report was filed with Ybarra's Rule 60(b) motion and is dated

9 February 19, 2012. ECF No. 177-2 at 36-47. That report states that "testing by four qualified

10 psychologists resulted in test scores substantially lower than those obtained by Dr. Gutride

11 through his intern," but the report only identifies three – Dr. Schmidt, Dr. T. Young, and Dr.

12 Mack. ECF No. 177-2 at 41-42. With respect to the first two, Dr. Greenspan does not address

13 any of the concerns raised by their reports and testimony (or the state court's findings on those

14 points) other than to mention that Dr. Schmidt felt that the score he obtained "might be a slight

15 underestimate of Mr. Ybarra's intelligence, given that he seemed to be somewhat distressed." *Id*.

16 And, despite Dr. T. Young's clear position to the contrary, the report states that "[n]one of these

17 psychologists questioned the sincerity of Mr. Ybarra's effort." *Id*. The second version of the

18 report, the one presented to the Nevada Supreme Court, is dated March 28, 2012, and corrects,

19 for the most part, these errors and omissions (presumably after they were brought to Dr.

20 Greenspan's attention). ECF No. 215-1 at 38-50. *Id*. at 42-44. Even so, the fact remains that both

21 reports were signed by Dr. Greenspan and filed as exhibits in this case.

22       As for the results obtained by Dr. Mack, the issue of whether Dr. Mack's assessment was

23 presented to the Nevada courts for purposes of § 2254(d) has been litigated in this case. This

court determined that it was not, and that determination was not disturbed on appeal. ECF No.

252 at 3-4. Thus, this court gives little weight to Dr. Greenspan's interpretation of Dr. Mack's

findings. In addition, other statements throughout Dr. Greenspan's report give this court pause.

For example, it states: "The Nevada Courts concluded that Mr. Ybarra was malingering because

he played cards, backgammon, scrabble and other games while at a mental health facility." ECF

No. 215-1 at 47. This is plainly inaccurate. Reports of Ybarra playing these games constituted a

very small part of the state district court's malingering analysis. The state court placed much

more emphasis on other evidence, such as reports from many health care professionals going

back to the time of Ybarra's arrest and the level of sophistication and writing skill demonstrated

by his numerous letters and prison kites.[15] ECF No. 177-1 at 4-19.

Thus, based on the foregoing, this court concludes that the Nevada Supreme Court's

intellectual functioning determination was not based on an unreasonable determination of the

facts for the purposes § 2254(d)(2).

*Age of onset*

The Ninth Circuit correctly held that the Nevada Supreme Court deviated from clinical

guidelines by "suggest[ing] that any diagnostic test conducted after the age of 18 was 'of little

___

[15] Dr. Greenspan gave Ybarra's written communications short shrift by focusing only on the prison kites, which he suggested were nothing more than "basic and routinized requests" and possibly written with the assistance of other inmates. *Id.* at 46-47. The state court cited several examples from Ybarra's kites and letters that went well beyond "basic and routinized" requests, such as one to a doctor in which Ybarra stated he had hypothyroidism and wrote that he wanted "any literature you have on the thyroid gland pertaining to its uses, functions, you know, why it's there, what it does. I really don't know anything about it...." ECF No. 177-1 at 7-18. Another example was "a scathing letter to a company that had apparently repossessed [Ybarra's] truck." ECF No. 177 at 101; ECF No. 212 at 101; ECF No. 212-1 at 2. As for the possibility that Ybarra had assistance, the state district court expressly rejected the notion that anyone other than Ybarra was the "author of hundreds of kites and letters which are mostly articulate, to the point, and written in his own hand." ECF No. 177-1 at 24; *see also Ybarra*, 247 P.3d at 279, 280 n.15.

value.'" *Ybarra*. 869 F.3d at 1026 (quoting *Ybarra*, 247 P.3d at 283). Plainly, petitioners raising

an *Atkins* claim may rely on scores from tests conducted after their developmental period to

demonstrate their intellectual functioning within the period. *See id*. n.10 ("[R]equiring

individuals to provide formal test scores from their developmental period would likely 'creat[e]

an unacceptable risk that persons with intellectual disability will be executed' because not

everyone who is intellectually disabled receives formal testing at a young age." (quoting *Hall*,

572 U.S. at 704)). As the Ninth Circuit noted, "the AAMR specifically contemplates

retrospective assessment when there are no test scores available from the developmental period."

*Id*. (citing AAMR-10 at 93-94).

       While it may have "overlooked" this deviation from guidelines in its prior decision, this

court concludes that the error did not render the Nevada Supreme Court's intellectual disability

determination unreasonable under § 2254(d)(2). As discussed above, the only sub-75 IQ scores

presented to the Nevada courts were determined to be invalid. And, just as the state court's "lay

perception" of Ybarra was not the reason, the fact that the tests were administered beyond the

developmental period was also not the reason the state court found them to be invalid.[16]

       Instead, the *only* test scores the state district court found to be valid were those obtained

by Dr. Gutride's testing in 1981. ECF No. 177 at 43-44. The Nevada Supreme Court reasonably

rejected Ybarra's challenges to the validity of those results, concluding that the state district

court's assessment of the Flynn effect "was not without foundation."  *Ybarra*, 247 P.3d at 282. In

his report, Dr. Greenspan discusses the Flynn effect, but, like the state court, his adjustment only

---

[16] There is a clear distinction between finding a test result to be invalid as opposed to suggesting
it was "of little value."

brings the Gutride score of 86 down to 78.[17] ECF No. 215-1 at 43. His only other challenges to Dr. Gutride's testing are third-hand allegations from a neoropsychologist's report claiming that Dr. Gutride "used an obsolete test with outdated norms" and "did not personally evaluate Mr. Ybarra himself instead transferring the responsibility to an intern." *Id*. What little credence these allegations might have are refuted by evidence that Dr. Gutride used the then-current version of the WAIS and that, notwithstanding any role the intern may have had, the test results had Dr. Gutride's imprimatur.[18]

Given the 1981 IQ score and the complete absence of a valid sub-75 score in the state court record, the "retrospective assessment" recommended by the Ninth Circuit would not have benefitted Ybarra's *Atkins* claim in state court. Simply put, if there was no valid test score before the state court establishing that Ybarra fell within the range of subaverage intellectual functioning *at any point*, it matters not that the Nevada Supreme Court failed to conduct or consider a retrospective assessment to determine if he did so within the developmental period. Consequently, the Nevada Supreme Court's "suggest[ion] that any diagnostic test conducted after the age of 18 was 'of little value'" did not render its Prong 3 determination unreasonable.

## V.     CONCLUSION

Based on the foregoing, this court concludes that, notwithstanding its erroneous adaptive deficits analysis, the Nevada Supreme Court's intellectual functioning determination stands as "an 'independent basis' for the intellectual disability determination, thus rendering it reasonable under AEDPA." *Ybarra*, 869 F.3d at 1027 (citing *Moore I*, 137 S.Ct. at 1053 (Chief Justice

---

[17] The report actually indicates an adjusted score of 77, but Ybarra concedes that "Dr. Greenspan made a minor mathematical error." ECF No. 299 at 75 n.45.

[18] Ybarra's argument that the score should be disregarded because Dr. Gutride's original testing data are not available is also without merit. *See Smith v. Ryan*, 813 F.3d 1175, 1186 (9th Cir. 2016).

Roberts's dissent "arguing that a proper determination under Prong 1 insulated an otherwise improper intellectual disability determination"). Having so concluded "in light *Brumfield* and in light of the Greenspan report" (*Id*. at 1033), this court will again defer, under 28 U.S.C. § 2254(d), to the state court decision to deny *Atkins* relief. Accordingly, the court will not conduct a de novo review of Ybarra's *Atkins* claim.

**IT IS THEREFORE ORDERED** that petitioner's motion for relief under Rule 60(b) (ECF No. 176) is DENIED with prejudice.

**IT IS FURTHER ORDERED** that the court grants a certificate of appealability as to the following issue:

> Whether this court erred in deferring, under 28 U.S.C. § 2254(d), to the state court's finding that petitioner is not intellectually disabled as contemplated by *Atkins v. Virginia*, 536 U.S. 304 (2002), and its progeny.

Dated: September 23, 2020

_____
U.S. District Judge Gloria M. Navarro